## G. W. GRANT V. C. E. CHAMBERS.

1. The case of Johnson v. The State, 33 Texas, 570, cited, and the rulings therein approved, to the effect that the civil tribunals of the rebel States were recognized and never abrogated by the acts of Congress known as the reconstruction laws, and also by the military authorities of the United States; and additional precedents and illustrations of these rulings are adduced in the present case.

2. It was the intention of Congress that the reconstruction acts should remain in force in Texas until the State should fully resume the functions of a republican government under her own Constitution and laws.

3. The courts organized by the provisional government established in Texas by the reconstruction acts, did not cease to have a legal existence after or in consequence of the adoption of the Constitution of 1869, or its acceptance in March, 1870, by the United States Congress. A district judge appointed by the provisional government continued, therefore, in office and fully invested with the judicial authority, after and notwithstanding the adoption and acceptance of the Constitution of 1869, and until his successor was appointed and qualified.

4. The writ of *quo warranto*, it seems, is the proper and only mode of questioning the official authority of a person exercising the judicial functions.

5. The act of June 18, 1870, assuming to validate the acts of district judges holding over by virtue of appointments received from the provisional government, was a work of supererogation. It may have served to quiet doubts, but was unnecessary to impart authority to those functionaries.

6. In vacation of the district court, the judge not only dissolved an injunction but also dismissed the bill. *Held*, to be error to dismiss the bill in vacation of the court.

APPEAL from Walker. Tried below before the Hon. N. Hart Davis.

The case is sufficiently stated in the opinion of the court.

*Abercrombie & Banton*, for the appellant.—As the law stood before the act of thirteenth of May, A. D. 1863, (article 3934,) injunctions could be dissolved only in term time. They could be then dissolved either by interlocutory judgment or by decree, according to the circumstances of the case. (Article 3936.) This can be understood in no other light than, first, a dissolution by interlocutory judgment, without determining the merits, or, secondly, by a decree against the principal and sureties after determining the merits, in which event damages might be assessed for delay. This view of the practice is made still more obvious by article 3937. The action of the court in the one case is termed an "interlocutory judgment," and from which no appeal can be taken, (Albright v. Mallory, 19 Texas, 106,) and upon the rendering of which the plaintiff in execution is required to give a refunding bond. The action of the court in the other instance is termed a decree, and is a final judgment, rendered against the principal and sureties in the injunction bond, upon which decree the court may award execution. This view of this statute (article 3936) was taken by this court in Cook v. Garza, 13 Texas, 447, and Pryor v. Emerson, 22 Texas, 165. Such being the law and the practice at the time of the passage of the amendment, (article 3934,) what are we to understand by the expression, "dissolved the same without determining the merits?" Evidently an interlocutory judgment dissolving the injunction and nothing more. If then this provision of the statute is to be regarded and enforced, but one question can arise : was the injunction in this case dissolved without determining the merits? If it was there was no error. In Albright v. Mallory the question was whether there was a final judgment in that case, and the court say

there was not, because there was no hearing on the merits. In Pryor v. Emerson the same question was raised and decided in the affirmative, because the merits were determined. If, then, there was a final judgment in this case the conclusion is inevitable that the merits were determined. That there was a final judgment is evident from the decree itself. "The case is dismissed because it appears to the court there are no equities in plaintiff's petition." This view is also evident from the execution issued on this decree. The petition of the appellant, Grant, prayed that the judgment first rendered against him be vacated and set aside, and that he have a new trial. Was the petition sufficient for this purpose, was a question for determination by the court, but a question which could only be determined in term time. And the question now presented for the consideration of this court, is, not whether the court rightly decided that question, but whether the court had a right to decide it in vacation. To this there can, we respectfully submit, be but one answer. But it may be said that though there was error in this, yet it is only an irregularity, and this court will look now at the bill, and if without equity, affirm the judgment; but this would be manifest injustice to appellants, because it would defeat the very object of the statute in prohibiting the court from determining the merits in vacation. The statute (article 54, Paschal's Digest,) gives either party the privilege of amending his pleadings before announcing ready for trial. But what is the privilege worth if the plaintiff's petition is to be acted on and dismissed in vacation, before there is a term of the court, when alone he can have leave to amend? If this practice were to obtain it would be dangerous indeed for a plaintiff to ask at the institution of his suit for the remedial writ of injunction. For let it be borne in mind that the injunction was not the sole, or even main object of this suit, but a new trial, the injunction being prayed for in the meantime. If the court take this view of the case it will render discussion of the other points unnecessary.

XXXIV—36

But if it should be held that the judge had the right to determine the merits of the petition in chambers, does it not, nevertheless, allege facts that show the judgment sought to be enjoined was a nullity? We maintain it does. It alleges that the person holding the position of judge and rendering the judgment, had been appointed to that position by the authority of the Provisional government, in existence before the inauguration of the State government. This the court judicially knows to be the fact. The judgment was rendered on the fifth of May, 1870, long after the provisional government ceased to exist, after the Constitution of the State had become the law of the land—that Constitution which declares that the State of which it is the fundamental law, " shall be divided into convenient judicial districts, for each of which one judge shall be appointed by the Governor by and with the advice and consent of the Senate." The question is this, can a man hold office in and administer the laws of Texas, reconstructed and clothed with all the habiliments of a legal government, who does not come into that office in accordance with the Constitution and the laws of Texas? Or can an officer of a provisional government hold that office after the government that created him has ceased to exist? Or can an agent after the death of his principal continue to act as such? In determining the validity of a grant of twenty-nine and a half leagues of land to General Chambers, in payment of his salary for one year as Provisional Superior Judge of Coahuila and Texas, this court said, " As the government then lasted sufficiently long to enable appellant to serve out his first year, and we are not apprised that a successor was ever appointed, we cannot say that the commissioners did not determine rightly, in awarding to him his one year's salary, as provided by law." (22 Texas, 535.) If the government had not lasted sufficiently long to enable appellant in that case to serve out one year he would not have been entitled to one year's salary, and simply because he could not hold office, discharge its duties, and receive salary there-

for longer than the duration of the government that gave him his official existence. We believe our position here is too evidently correct to be questioned, but it may be contended as an answer to it that the provisional government did not entirely cease and the State government was not entirely organized till all its offices were filled in accordance with the Constitution. But this position cannot be maintained either upon principle or authority. The Constitution cannot take effect and be in force by piecemeal—one provision to-day and one to-morrow. The whole must go into operation and be of force at one particular time. As Chief Justice Marshall expressed it in Owings v. Speed, *et al*, 5 Wheaton, 420, "both governments could not be understood to exist at the same time; the new government did not commence until the old government expired." When did the provisional government expire and the present State government commence? The Constitution does not expressly declare when that time is, but there is an implication in section forty-three, article twelve, that it should take effect when accepted by the United States Congress, and the reconstruction acts themselves contemplate that as the time when the reconstruction of the State would be complete.

That, the thirtieth of March, 1870, we believe, is generally conceded to be the date when our Constitution took effect; when the new government commenced and the old expired. But no one has contended for a later day than the twenty-sixth of April, when the Legislature assembled and accepted the condition imposed by the act of admission. Take either date, and the Constitution was in force when the judgment in question was rendered. But it is said this would create an interregnum, but this is not so ; an interregnum, allowing the greatest latitude of meaning of that word, is a space of time when the country is left without a government, and the rule insisted on would not leave the country without a government, but without a portion of the officers of government. This is an inconvenience the people experience and have to endure in change of

government, but is not an interregnum. An inconvenience that could have been prevented by a constitutional provision for officers of the old government to hold over, but no such provision was made. It was thought necessary to so provide in changing to the Republic of Texas, (Con. R. Texas, schedule, § 8, P. D., 36;) and from the Republic to the State of Texas. (Con. State, article 13, § 10, P. D., 74; see also the ordinance of the Secession Convention, "To provide for the continuance of the existing State government," P. D., 79.) In Bowmer v. Porter, 9 How., 235,' the Supreme Court of the United States say, without such a provision emanating from the convention that framed the Constitution of Florida, "an interregnum must have intervened;" this was prevented "in a few lines adopting the machinery of the territorial government for the time being." Upon the high authority of this case, and the case of Calkin v. Cocke, 14 How. 235, we maintain that without a provision in the Constitution, or an ordinance of the Convention that framed it, providing for officers of the provisional government holding over until their places could be filled under the Constitution, those places became vacant the moment the Constitution was adopted, and every act of those officers as such after that date was null and void.

But it is argued that, even if the position assumed by us were correct, that question cannot be raised in this suit, but must be raised by *quo warranto*. In answer to this it is only necessary to say, that if our position is correct, the judgment sought to be enjoined is a nullity, and advantage of that can be taken at any time and in any proceeding. (23 Texas, 104; 24 Id., 526.)

It is also contended that the act of the Legislature of June 18, 1870, (General Laws, 9,) has provided a remedy by validating the acts of provisional judges holding over. But it is not competent for the Legislature to validate that which is void. (Cooley's Con. Lim., 107.) Besides, if provisional judges ceased to have any judicial authority upon the adoption of the Constitution, for

the Legislature to give validity and judicial authority to their acts, would be to make them judges by legislative enactment, when they can only be made such by appointment of the Governor, by and with the advice and consent of the Senate.

In conclusion we submit, for the equitable consideration of the court, should it be held that the judgment is valid, that Grant, in his petition for new trial, shows that he regarded the court as without authority to render valid judgments; that the bar and country generally entertained doubts as to the validity of these acts—a fact recognized by the act of June 18, 1870; that, under these circumstances, his course to pursue was to not recognize the validity of the court by making an appearance, and if he had filed an answer before to have withdrawn it, and not have his rights passed upon by an illegally constituted court. When he has chosen this course, and is abundantly sustained in it by reason, authority, and the general doubts entertained by the bar, is it right, is it law, is it equity, when he seeks in the proper way, before a lawful court, to have this void judgment set aside, that he may avail himself of his equitable defense, to send him out of court in vacation, and assess damages against him for delay? When an appeal presents grave and important questions, damages are never assessed by the Supreme Court for delay; and when a petition for injunction presents one of the gravest and most important questions ever submitted to the courts of this State, is it not error for the judge to assess damages for delay? The Congress of the United States has declared in the preamble to the act of March 2, 1867, to provide for the more efficient government of the rebel States, that no legal government existed in the State of Texas, and in section six, that such government as did exist therein, until said State was admitted to representation in the Congress of the United States, shall be deemed provisional only. And we submit that the whole tenor of that act shows that the provisional government was merely intended to afford adequate protection for life and property,

and the Convention took the same view when they declared in section forty-three, article twelve, of the Constitution, that the statutes of limitation shall be considered as suspended within this State, until the acceptance of this Constitution by the Congress of the United States. That is equivalent to saying, the government in existence not being legal, and only intended for protection of life and property, parties will not lose any right of action by not going into the courts of this illegal government to assert those rights; and should others seek remedies in those courts in civil suits, the defendant will lose no right by refusing to answer or plead in such actions. After being, we might say, thus encouraged to pursue this course, will this court punish appellant with the total loss of his defense, and with heavy damages besides for pursuing it? We think not.

*Baker & Maxcy*, for the appellee.

Walker, J.—Chambers recovered a judgment against Grant by default on the fifth day of May, 1870, before the Hon. N. Hart Davis, a district judge under the provisional government.

Grant sued out an injunction to restrain the collection of the judgment. In his petition he stated a meritorious defense to the action, which he had declined to make on the original trial, together with his reasons for not doing so.

Chambers answered by general and special demurrer, and also plead to the merits, and during the vacation of the court moved to dissolve the injunction and dismiss the bill.

Judge Burnett, before whom the cause was pending, on hearing of the motion, dismissed the bill and rendered a judgment for damages. The judgment was against the appellant as the maker of a promissory note dated February 10, 1858.

The appellant insists that injustice has been done him by the dismissal of his bill; that he has offsets against the payee and indorsers of the note, which he "did not deem it necessary to

plead," because, *in his judgment*, the presiding judge had no authority to render a valid judgment.

It is urged that after the acceptance of the Constitution of 1869, by the Congress of the United States, the provisional courts ceased to have any legal existence, and that we had no courts in Texas until they were organized under the present Constitution.

This question is one of great importance, and we should treat it as such were it now for the first time before this court. But it is in reality *res adjudicata.* The case of Johnson v. The State, decided at the Tyler term, 1870, held at Austin, was a case involving this question; and inasmuch as the opinion of the court in that case has not been reported, but was delivered by the same member of the court to whose lot it has fallen to write the opinion of the court in the case at bar, we shall simply reiterate that opinion, adding to it some additional authorities, which were omitted at the time, not because they had not been examined and regarded as of material weight in the case, but because it was considered by the court, as then constituted, that the opinion might rest rather upon the force of reason than upon the weight of authority:

" On the first exception to the jurisdiction it is contended that the court before whom the case was tried had no legal existence. It was a court created by the Legislature of 1866. Reference is made to the act of Congress passed March 2, 1867, and the preamble to the act is thus cited:

" ' Whereas, no legal State governments, or adequate protection for life or property now exist in the rebel States of Virginia, North Carolina, South Carolina, Georgia, Mississippi, Alabama, Louisiana, Florida, Texas and Arkansas; and whereas, it is necessary that peace and good order should be enforced in said States, until loyal and Republican State governments can be established, therefore,' etc.

" The first and second sections of the act go on to provide a mode

of governing the rebel. States by the military authority of the government. The third section reads in part as follows: "And be it further enacted, that it shall be the duty of each officer, assigned as aforesaid, to protect all persons in their rights of person and property; to suppress insurrection, disorder and violence, and to punish, or cause to be punished, all disturbers of the public peace, and criminals; *and to this end he may allow local civil tribunals* to take jurisdiction of and to try offenders,' etc.

"This section clearly recognizes the existence of local civil tribunals, with competent jurisdiction to try offenders and criminals; and it is, perhaps, useless to say that the military commanders, as well as this court, have never doubted the legal existence of these civil tribunals. The military commanders were fully authorized, in certain cases, to adopt other modes of trial; but, we believe, they have uniformly preferred that persons accused of crime should be tried by the civil courts, when there was even a remote probability of the ends of justice being met, and have used the military authority with great reluctance and moderation. The acts of Congress, passed March 2 and March 23, and July 13, in 1867, gave to the rebel States provisional governments which were intended to make as few innovations upon the civil authorities, and to do as little violence to the popular ideas of State government, as possible under all existing circumstances.

" The national legislature used its legitimate powers with moderation and magnanimity, endeavoring to encourage the formation of republican governments in these States, and bring the people back to a due appreciation of law and the liberty which had been secured to the free enjoyment of every citizen under the Constitution of the United States.

"The court in which the appellant was tried was one of the local civil tribunals found in existence at the time the reconstruction laws were passed, and was was not abolished by them, nor by

any order of the commanding generals. · It derived its existence from the same source from which the legal existence of this court emanates, and from which we were allowed to call a convention to frame a constitution. The people were called upon to vote upon its adoption, to elect a Governor and choose members of the Legislature and other officers. We have no officer in any department of our present government chosen under the Constitution of 1869. The Governor, Lieutenant Governor, heads of departments, members of the Legislature and local officers, all owe their official existence to the laws of Congress before referred to.

" The courts, which have been recognized by these laws, and the officers appointed to administer them, had an existence prior to the enactment of these laws themselves, and the judiciary of the State, to-day, is the only branch of the government which owes its existence to laws enacted by the people of Texas; whilst, at the same time, the judges have, in perhaps every instance, been appointed by the military commander of the Fifth Military District, yet they have been appointed in pursuance of laws already existing at the time of the passage of the reconstruction laws, which have never been set aside by Congress, or repealed by any authority, to affect the legal existence of the courts. It is very true that we have adopted a new Constitution, and under it have been readmitted to our former position in the Union ; but we have elected no Legislature, no Governor, no officers of any kind under it, but under the reconstruction acts we elected all these officers, expecting them to go forward and, by necessary legislation, organize a government for the State under it, and under the Constitution, laws and treaties of the United States.

"The first section of the bill of rights in the constitution of 1869, reads thus :

" ' The Constitution of the United States, and the laws and treaties made and to be made in pursuance thereof, are acknowledged to be the supreme law ; that this Constitution is framed in

harmony therewith, and in subordination thereto, and that the fundamental principles embodied herein can only be changed subject to the national authority.'

"This Constitution, then, did not pretend to abrogate the authority of the laws under which it was framed, and without which it would have had no existence, but it is intended, in due time and under proper initiatory legislation, to furnish the people a permanent law for their government, paramount, except as to the Constitution and laws of the United States; and to them, by its own terms, it is in subordination.

"General Orders No. 74, dated Headquarters Fifth Military District, April 6, 1870, section four, reads thus, 'All civil officers will continue in the discharge of their present duties until relieved by qualified successors, to whom they will turn over all records and public property pertaining to their respective offices.'

"But this is no new principle of law. On the other hand, it is the universal rule, founded in the necessities of governments, that there shall be no void, hiatus, or interregnum, in the offices of government; that the king may die, or be dethroned, or cease to reign, are all facts admitted in monarchies, but none admit that the office of king can lapse; and upon this principle the office of governor, of legislators, and of judges will always exist. Yet the incumbents may and often do change, the old officer holding until his successor is prepared to take his place, except when vacancies occur unexpectedly, and when it is frequently provided that the office shall devolve upon some other designated person, as in the case of the presidency, and the gubernatorial office of the different States.

"We are therefore clearly of opinion that the court in which appellant was tried was a legal tribunal, of competent jurisdiction to try such cases; and that the plea to the jurisdiction was properly overruled."

In 1st Texas, in the case of Aulanier v. The Governor, 653, it was held that a person acting as an officer, under color of a commission, is *de facto* such officer until ejected by a proceeding having that object directly in view, and his authority cannot be question in a collateral way. His official acts, until ejected, are valid.

In 13th Texas, 631, Trevino v. Fernandez, the learned Chief Justice delivering the opinion of the court says : " The acts of the Mexican authorities, in the territory adjacent to the Rio Grande, while that territory remained *de facto* under their control, although subsequent to the declaration of her boundary by the Republic of Texas, in the ordinary administration of the laws and municipal affairs, so far as individuals are concerned, were as valid and binding as if done by the government *de jure* as well as *de facto*. Principles analogous are recognized in the case of the United States v. Rice, 4 Wheaton. The court say, by the conquest and military occupation of a portion of the territory of the United States by a public enemy, that portion is to be deemed a foreign country, so far as respects our revenue laws.

Goods imported into it are not imported into the United States, and are subject to such duties only as the conqueror may impose.

The subsequent evacuation of conquered territory by the enemy, and resumption of authority by the United States, cannot change the character of past transactions. The *jus postliminii* does not apply to the case; and goods previously imported do not become liable to pay duties to the United States, by the resumption of their sovereignty over the conquered territory.

In the matter of the Grape Shot, reported first in 7 Wallace, 563, the Supreme Court of the United States recognized the act of the Provisional Court of Louisiana, a court established by the President of the United States during the rebellion.

The case had been transferred from this court to the Circuit Court of the United States. The Supreme Court said that in a matter of an appeal, the decree of the provisional court must be

regarded as the decree of the circuit court, which took the place of this provisional court, on the restoration of peace.

This case is again reported in 9 Wallace, 129, and Chief Justice Chase, in delivering the opinion of the court, again sustains the President and the provisional court, remarking " that the late · rebellion, when it assumed the character of civil war, was attended by general incidents of a regular war, has been so frequently declared here that nothing further need be said on that point.

"The object of the national government, indeed, was neither conquest nor subjugation, but the overthrow of the insurgent organization, the suppression of insurrection, and the re-establishment of legitimate authority.    But in the attainment of these ends through military force it became the duty of the national government, wherever the insurgent power was overthrown, and the territory which had been dominated by it was occupied by the national forces, to provide, as far as possible, so long as the war continued, for the security of persons and property, and for the administration of justice.

" The duty of the national government in this respect was no other than that which devolves upon the government of a regular belligerent, occupying, during war, the territory of another belligerent.    It was a military duty, to be performed by the President as commander-in-chief, and intrusted as such with the direction of the military force by which the occupation was held.

" What that duty is, when the territory occupied by the national forces is foreign territory, has been declared by this court in several cases arising from such occupation during the late war in Mexico.

" In the case of Leitensdorfer v. Webb, 20 Howard, 176, the authority of the officer holding possession for the United States to establish a provisional government was sustained ; and the reasons by which that judgment was supported apply directly to the establishment of the provisional court in Louisiana.   The case of

Jecker v. Montgomery, 13 Indiana, 498, and 18 Id., 110, and Cross v. Harrison, 16 Indiana, 164; also United States v. Rice, 4 Wheaton, 246, and Texas v. White, 7 Wallace, 700, may also be cited in illustration of the principles applicable to military occupation.

"We have no doubt that the provisional court of Louisiana was properly established by the President in the exercise of his constitutional authority during war; or that Congress had power, upon the close of the war, and the dissolution of the provisional court, to provide for the transfer of cases pending in that court, and of its judgments and decrees, to the proper courts of the United States."

We have no doubt that it was the true intent of Congress that the reconstruction laws should remain in full force in Texas until such time as she should fully assume the functions of a republican government, under her own Constitution and laws. When, in 1815, the Duke of Wellington declared martial law in France, he directed that the civil tribunals should continue to discharge their functions in all matters arising between the citizens of the country, and after the withdrawal of the allied armies the same courts were recognized under the reformed government; and no question was ever raised as to their legal existence, or the validity of their acts during the military occupation of the country, although some of the judges had been appointed by the commander in chief of the allied armies.

When, in 1867, the United States saw proper, from whatever reasons, to place the State of Texas under military government, it expressly recognized the existence of "local civil tribunals," and authorized the military commander to refer to their jurisdiction all matters which the then existing condition of the country rendered it safe and expedient should be so referred.

Now, these "local civil tribunals" were created by the people of Texas; they were honorably recognized by Congress; no one

---

of them was ever legislated out of existence, nor ordered out by any military commander. They were kept alive as the indispensable safeguard of life, liberty and property to the citizen; and when, in 1869, the military occupation of the country was withdrawn, the judicial tribunals alone survived.—every other department of government had to be created anew by the people.

It is false to history if any one should say that the United States either destroyed or disregarded the civil courts of the State of Texas.

But, if the laws of Texas were properly understood, as they have been recognized by the Supreme Court since the very organization of the Republic, or at least since 1847, we should not now be called on to reiterate our former decisions.

If the acts of Judge Davis were to be called in question, they should have been tested by the writ of *quo warranto.* (See Wright v. Allen, 158, 2 Texas; Banton v. Wilson, 400, 4 Texas.)

On the eighteenth of June, 1870, the Legislature, doing a work of supererogation, passed an act which was intended to give validity to the acts of the judicial tribunals of the State, until such time as new judges might be appointed under the new Constitution. Although this act was totally unnecessary, and proposed to impart authority where it had none to give, yet it perhaps served to quiet the minds of those who were in doubt.

But the judgment of the district court in dismissing the bill at chambers, and during the vacation of the court, was erroneous, and for this cause alone the judgment is reversed and the cause remanded.

                                        Reversed and remanded.