ANNIE E. DANIEL ET AL. V. J. C. HUTCHESON.

· No. 27.

**1. Military Government in Texas.**

Although the State of Texas was admitted to be entitled to representation in Congress on March 30, 1870, not until April 16 following was military rule relinquished; and until that date the military government under the Reconstruction Laws of Congress continued to exist ...... ........................................................... 59

**2. Military Courts.**

The power of the United States to establish and maintain military courts during the reconstruction period is fully recognized by the Federal and the State courts.............................................. 61, 63

### 3. Same—Constitution of 1869.

Under the facts existing, it was not for the people of Texas to determine, by their Constitution or otherwise, when military rule should cease, or to what extent the administration of civil affairs should be controlled by military power. These were questions for the decision of the dominant power holding military possession.................. 62

### 4. Same.

The Constitution of 1869 was formed and adopted in pursuance of the Reconstruction Acts of Congress. andwas as valid and binding a law, in so far as it purported to affect private rights, as were laws already existing. It did not, however, affect the right of the United States to determine when the political relation formerly existing should be restored, by the removal of the military government..... ........... 64

### 5. Duration of Military Courts in 1870.

The military government was not proclaimed to be at an end in Texas until April 16, 1870. And the earliest period at which it can be claimed that County Courts ceased to have probate jurisdiction is the period at which the State Government was in operation under the Constitution of 1869 ........................................................ 65

### 6. Case in Judgment.

Probate sale made and approved in 1870, and before the 16th of April, in Harris County, in administration pending in the County Court, passed title to the purchaser, notwithstanding the Constitution of 1869 deprived County Courts of probate jurisdiction..................... 67

ON CERTIFICATE OF DISSENT from Court of Civil Appeals for First District, in an appeal from Harris.

*F. G. Morris* and *W. F. Robertson*, for appellants. — The Constitution of 1869 repealed all of the Constitution of 1866, that part of it providing for a County Court as well as other parts, and all laws vesting jurisdiction in courts inconsistent with the provisions of the Constitution of 1869 as to jurisdiction of courts; and there being no provision in the Constitution of 1869 for continuing, for any length of time, the jurisdiction of courts exercising powers which they were not invested with under the new Constitution, such County Courts, as courts of probate jurisdiction, became extinct when the Constitution of 1869 took effect; and therefore the order of sale and confirmation of sale in question, which were made after said Constitution of 1869 took effect, were null and void, and are not in fact made by a court. Peak v. Swindle, 68 Texas, 242; Hildreth v. McIntyre's Devisees, 1 J. J. Marsh., 206; Foster v. Daniels, 39 Ga., 39; Strickland v. Griffin, 70 Ga., 546; Pelham v. Murray, 64 Texas, 477; Neal v. Bartleson, 65 Texas, 485; Rogers v. Kennard, 54 Texas, 30; Giddings v. Messner, 65 Texas, 301; Calloway v. Foster, 93 U. S., 573; McMullen v. Guest, 6 Texas, 275; In re Will of Brown, 34 Cal., 682; Knox v. Garrett, 28 La. Ann., 168; Commonwealth v. Hampden, 6 Pick., 501; Miller's Case, 1 W. Black., 451; Baker v. Terrell, 12 Gray, 154; Rail-

way v. Varnell, 98 U. S., 479; Wells on Juris., secs. 69, 70; Butler v. Palmer, 1 Hill, 324; North Canal St. Road, 10 Watts, 35; Fenelon's Petition, 7 Pa. St., 173; Canal Co. v. Chicago, 14 Ill., 334; Macnawhoc Plantation v. Thompson, 36 Me., 365; Sedg. on Con. of Stat. and Const. Law, 109, 110, 111; Suth. on Stat. Con., secs. 165, 464.

Counsel supported motion for rehearing by an exhaustive argument, urging:

1. That the decisions of the Supreme Court of the United States which we have cited, and a decision of Chief Justice Waite, which this court approved in Swindle v. Peak, thoroughly establish the proposition that the course of governmental affairs was not affected by the military occupation of the State, except as to those departments or offices with reference to which the military power was actually exerted, and only to the extent that the military authority was exerted.

2. That the military authority was never exerted so as to affect the taking effect of the Constitution of 1869, but was only used to control the administration of certain offices after the Constitution was adopted, and that no action was ever taken looking to the creation of a court or the continuance of the office of county judge, notwithstanding its abolishment by the Constitution. That the military authority merely appointed officers to fill the office while it lasted, which appointees were civil officers, exercising the functions of a civil office, and not military officers exercising duties prescribed by the military authority.

3. That the County Court became extinct by the adoption of the Constitution, and was never revived by any order of the military authority.

4. That if the Constitution never before took effect, that it did take effect upon the extinction of military authority in the State, March 30, 1870, and that as there was then no de facto government supporting General Reynolds, and he not having established a government over this country which displaced Federal and State authorities, he was not a de facto officer who, as a military officer, could perform acts that would be valid when acting in contravention to the laws of the State of Texas.

5. That when the organic or statutory law conferring jurisdiction on a court is repealed, without making provision for pending business, the court can not maintain a de facto existence for the purpose of disposing of pending cases, but they die with the law.

*Hutcheson & Sears,* for appellee.—The precise point involved in this case is reflected in the opinion and the dissenting opinion of the Court of Civil Appeals; but while the dissenting judge does not attach importance to the existence of military authority in this State as supporting his views, yet we regard that as sufficient, if not of paramount significance, to aid this court in arriving at its conclusion, and will urge the existence of such

authority upon the attention of this court, and we submit the case upon the following:

1. At the time the Constitution in this State was adopted there existed in the State of Texas, under the Reconstruction Acts, a provisional government under military authority, which superseded all other actual government, and which continued in actual possession and control of the government of this State until the 16th day of April, 1870. We maintain, that both from the phraseology of the Constitution, wherein it provides for such proceedings in the probate matters as should be thereafter provided for by the Legislature of the State, and from the fact that military rule actually existed in this State until such legislation was had, and until a period beyond the time when this sale was made, that the Constitution was not intended to interfere with the existing tribunals, nor to go into effect as to probate matters until civil authority superseded military, and until the Legislature should provide for the conduct of probate proceedings in the new tribunal for which the Constitution provided. Any other construction would produce an interregnum in government, and would destroy rights innocently acquired during the old regime under military supervision and protection, and therefore by force of the proper interpretation of the Constitution itself, and by force of military government, which did exist at the time of the sale of the property by the county judge of Harris County, the same was legal and should be maintained.

Under the proposition that such was the intention of the Constitution, see the case cited by Judge Pleasants in his opinion, and the following: Stone v. Hill, 72 Texas, 540; Womack v. Womack, 17 Texas, 1.

Authorities which show that military power being in actual existence, whether rightfully or not, superseded all law, and sanctioned acts done thereunder: O'Brien on Courts Martial, 26; Bish. on Crim. Law, secs. 45, 52, 61–64; Ableman v. Booth, 21 How., 516, 517; Acts 1870, called sess., 244, 245; Luther v. Borden, 7 How., 1.

2. The acts of the de facto judge are valid and binding, though the law under which he was appointed is afterwards declared unconstitutional and void. Black on Judg., sec. 175, et seq.; The State v. Carroll, 38 Conn., 449; Keene v. McDonough, 8 Pet., 308; Campbell v. The Commonwealth, 96 Pa. St., 344; Gregg v. Jamison, 55 Pa. St., 468; Carli v. Rhener, 27 Minn., 292; The State v. Williams, 5 Wis., 308; Cary v. The State, 96 Ala., 78; Threaddill v. Railway. 7 N. C., 178; Woodside v. Wagg, 71 Me., 207; Cramer v. Boinest, 27 S. C., 436.

We respectfully urge upon the court, that from the language employed in the Constitution, giving the District Court probate power, to-wit, " under such rules as the Legislature may prescribe," and from the necessity of submission to existing government of the military powers until they chose to remove or were withdrawn by the President, and from the

further necessity of there being an interregnum (which can never be contemplated by the government) if existing laws were immediately suspended as to probate matters, it was never intended that the said act regarding probate jurisdiction in the District Court should take effect until the Legislature had provided some means by which the pending business should be transferred from the Probate Court to the District Court, and for conducting the disposition of it; and all things actually done and executed under an actual physical government should be upheld.  Otherwise millions of property in this State, honestly and innocently acquired at probate sales, must have titles destroyed, and innocent parties suffer for what they did not produce, nor could they prevent.

STAYTON, Chief Justice.—The lot in controversy belonged to R. W. Dowling, who died during the year 1867, in Harris County, Texas.

This action was brought by his surviving widow and children, and it was tried on the agreed statement of facts, from which it appears, that Mrs. Dowling (now Mrs. Daniel), during the same year of her husband's death, was appointed administratrix of his estate, and qualified.

On her application the County Court of Harris County, in the month of February, 1870, ordered the sale of the lot in controversy, to raise money to pay debts of the estate; and in pursuance of that order it was sold on April 5, 1870, and that sale was confirmed by that court.

The agreement states, "That the county judge appointed by General Reynolds, of the army of the United States, in military command of the department including Texas, continued to act as county judge, and the order of sale and confirmation herein referred to were made in the County Court as held by him in said Harris County at the dates above stated."

It was further agreed: "If at the time of said order of sale and confirmation thereof the said County·Court had jurisdiction generally of administrations of estates of deceased persons, or power to make such orders, then the plaintiffs have no title; but if said court did not then have the general jurisdiction of administrations of deceased persons, then plaintiffs have title to said lot number 28; and we submit to the court the legal question, Did the County Court have jurisdiction to make orders of sale and confirm sales at the time said orders were made, in administrations pending in said court when the Constitution of 1869 took effect?"

The District Court held, under the agreed facts, that the County Court had jurisdiction to order and confirm the sale, and rendered a judgment in favor of the defendant.

On appeal, a majority of the judges of the Court of Civil Appeals held, that upon the adoption of the Constitution of 1869 by a vote of the people, County Courts ceased to exist; that probate jurisdiction theretofore exercised by them under the terms of the Constitution at once vested in

the District Courts, who might exercise such jurisdiction without further legislation.

. The majority further held, that the condition of the country and the imposition of a military government on the people and territory of the State, continued until after the sale was made and confirmed, did not suspend the jurisdiction of District Courts in probate matters, or continue the right of County Courts to exercise such jurisdiction as under the Constitution of 1866 they were clothed with.

One of the judges of that court, however, held, that in so far as it affected the jurisdiction of District Courts, the Constitution of 1869 could not become operative until the Legislature should redistrict the State and fix a time for holding courts in the several districts; that the District Courts provided for by the Constitution of 1869 were essentially different courts from those organized under the Constitution of 1866, the latter having no original probate jurisdiction, while the former were clothed with such probate jurisdiction as under the former Constitution was possessed by County Courts, as well as the power conferred on District Courts by the former Constitution; and from this an inference was drawn that it was the intention of the people that the District and County Courts should continue to exercise the jurisdiction conferred upon them by the Constitution of 1866 until the reorganization of District Courts through proper legislation under the Constitution of 1869.

The cause comes before this court on certificate of dissent.

The inquiry in this case is, Did the County Court have jurisdiction to order and confirm the sale at the time it assumed to do so?

If it had, this settles the right of the parties, and an inquiry as to the time when District Courts, under the Constitution of 1869, acquired jurisdiction over probate matters is not a material inquiry.

In determining the question presented, we do not feel authorized to look alone to the Constitution of 1869, disregarding the condition of affairs existing at the time that Constitution was adopted by the vote of the people, and the subsequent condition; for in our opinion these are matters that must be considered in determining the power of the County Court for Harris County at the time it ordered and confirmed the sale in question.

A brief statement of facts will be necessary to a proper understanding of the condition of affairs existing prior to and at the time these orders were made.

The Civil War, in fact, ended in May, 1865, if by "war" be meant "a contest between States, or parts of States, carried on by force;" but at its close military possession was taken, and a provisional Governor was appointed by the President of the United States, by whom State, district, and county officers were appointed.

A constitutional convention was called, which convened on February

7, 1866, and so amended the Constitution of the State as to meet the changed condition of affairs brought about by the result of the war and amendment to the Constitution of the United States. These amendments were ratified by the people.

One of these amendments increased the number of judges of the Supreme Court, and made them elective by the people, as were all other judges.

Another created County Courts, with jurisdiction such as County Courts did not have under the former Constitution, but still conferring on them the probate jurisdiction theretofore possessed.

All officers provided for by that Constitution were elected and entered upon the discharge of their respective duties.

The Legislature met and passed laws, and the State Government was again administered by officers holding under the terms of the Constitution; all the courts were held by judges elected as the Constitution prescribed, and county and municipal officers selected in the same manner were in the discharge of their duties.

On August 20, 1866, the President of the United States decided that the war had ended in Texas, and so proclaimed; but on March 2, 1867, Congress passed what has been known as the first of the "Reconstruction Laws."

These declared that no legal State Government existed in Texas and in other States named; divided the Southern States into military districts, made subject to the military authority of the United States, and directed that an officer of the army, not below a named rank, should be assigned to command in each district; and it was declared "that all interference, under color of State authority, with the exercise of military authority under this act shall be null and void."

The act further provided, that it should become inoperative in each State when the people should adopt Constitutions containing requisites mentioned, and should also adopt the Fourteenth Amendment and it became a part of the Constitution of the United States, provided the State was admitted to representation in both houses of Congress.

The law further provided, "That until the people of said rebel States shall be by law admitted to representation in the Congress of the United States, any civil government which may exist therein shall be deemed provisional only, and in all respects subject to the paramount authority of the United States at any time to abolish, modify, control, or supersede the same."

A military officer was appointed in each district; and in Texas this officer exercised powers legislative and executive, if not judicial.

Officers elected under the Constitution were removed from office, and others appointed in their places; but some question having been made of the power of the commandant in each district to do this, on July 19,

1867, Congress passed another law, in part explanatory of the act referred to and of an intervening act, in which it was declared " to have been the true intent and meaning of [the acts before referred to] that the governments then existing in the rebel States [naming them] were not legal State Governments; and that thereafter said governments? if continued, were to be continued subject in all respects to the military commanders of the respective districts and to the paramount authority of Congress."

The act last referred to further conferred upon the commander of any district, subject to the approval of the General of the Army of the United States, the power to remove from office any person holding or exercising any office, civil or military, claimed or held under any State or the government thereof, or any municipal or other division thereof, and to supply their places by some officer or soldier of the army, or by the appointment of some other person.

The same power was granted to the General of the Army of the United States, and acts of officers in removing civil officers before the passage of the last act were confirmed.

The act further provided, " That no district commander or member of the board of registration, or any of the officers or appointees acting under them, shall be bound in his action by any opinion of any civil officer of the United States."

On July 30, 1867, the Governor of the State elected under the Constitution as amended in 1866, was removed from office, and a provisional Governor was appointed, who held office until September 30, 1869, when he resigned, and from that time until January 8, 1870, the executive duties were performed by an adjutant of the general in command, placed in charge of civil affairs.

On June 1, 1868, a convention assembled to frame a Constitution for the State in pursuance of the act of Congress, and that body, with the assistance of the commanding general, succeeded in putting in form that which subsequently became the Constitution of 1869.

By the ordinance of the convention, this draft of a Constitution was to be submitted to the vote of the people on the first Monday in July, 1869, but by proclamation of the President the election was postponed until November 30, 1869, and on that and the three succeeding days the election was held, and that Constitution adopted.

At the same election at which the Constitution was adopted all the officers made elective by the Constitution were elected, in accordance with the act of Congress empowering the President to direct the election to be held.

The Governor and Legislature were elected, and the latter met on February 25, 1870, and ratified the amendments to the Constitution of the United States, and elected United States Senators, when it adjourned until April 24 of same year.

The Governor elect did not qualify as Governor until April 28, 1870, but on January 8, preceding, he was appointed provisional Governor by the officer in command of the district.

On March 30, 1870, the act admitting the State to representation in Congress was approved, and on the next day Senators and Congressmen elected at the election begun on November 30, 1869, took the oath of office.

The Constitution of 1866 made the Supreme Court to consist of five judges, elective by the people, while the Constitution of 1869 made the court to consist of only three judges, to be appointed by the Governor; but the judges appointed by the military authorities continued to act until the December Term, 1870, when began the services of those appointed under the Constitution of 1869.

No appointments of district judges were made under the Constitution of 1869 prior to July, 1870, and the judges of these courts appointed by the military authorities continued to act.

From the time the Constitution of 1869 was adopted by a vote of the people until the reorganization of the State Government under that Constitution, District Courts exercised only such jurisdiction as was conferred on them by the Constitution of 1866, and many of them did not exercise probate jurisdiction until the autumn of 1870.

Judges of County Courts appointed by the military authorities continued to hold office, and to exercise the probate jurisdiction conferred on these courts by the Constitution of 1866, until after the reorganization of the State Government under the Constitution of 1869.

Although the State was admitted to be entitled to representation in Congress on March 30, 1870, not until April 16 following was military rule relinquished. On that day, by general order number 74, the military commander declared that the State had resumed her practical relations to the General Government, and that all authority conferred upon him by the Reconstruction Laws was remitted to the civil authorities; but that order declared, " that all civil officers will continue in the discharge of their *present duties* until relieved by qualified successors;" and it directed, that " the Supreme and District Courts of the State will continue in the discharge of their respective duties until the new courts shall be inaugurated."

This order was recognized by the Legislature, which assembled on April 26, 1870. Joint Resolution approved August 15, 1870.

From this statement it will be seen that military government, under the Reconstruction Laws, continued to exist in the State until April 16, 1870; and, in effect, to some extent even after that date. Prior to that date, however, the facts transpired on which the rights of the parties depend.

Whether civil government, for so long a period and to such extent,

was wisely or even lawfully superseded, is now an irrelevant inquiry; for in deciding private rights we must look to the facts then existing.

That the State was governed by military law, even though its own laws may to some extent have been recognized and administered, must be considered an established fact.

The power of the United States Government to impose such a rule upon the State must be recognized as fully, under the facts existing, as though Texas had theretofore been an independent sovereignty, having no relation to the United States than that usually sustained by one independent nation to another.

Civil war had existed of magnitude seldom exceeded, resulting in the overthrow by force of arms of the cause the State had espoused, and the occupation of her territory by a hostile army.

This occupancy was continued, and under the laws of war furnished ground for the establishment of military law. This was done under the express requirement of acts of Congress.

The power of the United States Government during the war in territory of which they had military possession is thus stated: "Although the city of New Orleans was conquered and taken possession of in a civil war waged on the part of the United States to put down an insurrection and restore the supremacy of the National Government in the Confederate States, that government had the same power and rights in territory held by conquest as if the territory had belonged to a foreign country and had been subjugated in a foreign war. In such cases the conquering power has a right to displace the pre-existing authority, and to assume to such extent as it may deem proper the exercise by itself of all the powers and functions of government. It may appoint all the necessary officers, and clothe them with designated powers, larger or smaller, according to its pleasure. It may prescribe the revenues to be paid, and apply them to its own use or otherwise. It may do anything necessary to strengthen itself and weaken the enemy. There is no limit to the powers that may be exerted in such cases, save those which are found in the laws and usages of war." New Orleans v. Steamship Co., 20 Wall., 393.

This language, strong as it may seem, asserts a rule of international law recognized as applicable during a state of war, and it was used in considering the power of a mayor of the city of New Orleans, appointed by the military authorities of the United States during the occupancy of that city in 1865, to make a lease for a term of years of a water front property belonging to the city.

Reference to some cases will be made for the purpose of illustrating the extent to which such powers have been exercised, and the binding effect given to them, in so far as they operated on private right.

In 1862, while the United States troops occupied New Orleans, the President, by proclamation, created a provisional court for the State of Louisi-

ana, with authority, among other powers, to hear, try, and determine admiralty causes. By that court a decree was rendered against the vessel that gives style to the cause, and subsequently a question arose as to the validity of the court.

The Supreme Court of the United States, after stating that the civil war was attended by the general incidents of a regular war, pointed out the objects to be attained, and said: "But in the attainment of these ends through military force, it became the duty of the National Government, wherever the insurgent power was overthrown, and the territory which had been dominated by it was occupied by the national forces, to provide, as far as possible, so long as the war continued, for the security of persons and property and for the administration of justice. The duty of the National Government in this respect was no other than that which devolves upon the government of a regular belligerent occupying, during war, the territory of another belligerent. It was a military duty, to be performed by the President as commander-in-chief, and entrusted as such with the direction of the military force by which occupation was held." It was held, that the court was properly established by the President in the exercise of lawful power existing during the war. The Grapeshot, 9 Wall., 132.

The same court rendered a judgment for money against a defendant, under which his plantation was sold, and the title of the purchaser was sustained by the Supreme Court of the United States. Burke v. Miltenburger, 19 Wall., 524; Lewis· v. Cocks, 23 Wall., 469. In that case the Supreme Court again considered the nature of the power exercised by the President and the validity of the court.

Still another court was established in New Orleans during the war, by the general commanding the United States Army then occupying that city; and that court rendered a very large judgment against a defendant, who subsequently questioned its jurisdiction and sought relief from its judgment. The matter went before the Supreme Court of the United States on writ of error, and that court sustained the jurisdiction of the court.

In the course of the opinion it was said, after referring to several decisions: "In view of these decisions, it is not to be questioned that the Constitution did not prohibit the creation by military authority of courts for the trial of civil cases during the civil war in conquered portions of the insurgent States. The establishment of such courts is but the exercise of the ordinary rights of conquest." Mechanics Bank v. Union Bank, 22 Wall., 276; same case, 25 La. Ann., 387. The case of Pennywitt v. Eaton involved the same general question, and was decided in the same way. 15 Wall., 382.

After the United States, in 1846, had military possession of Upper California, the military and naval commanders were instructed to estab-

lish a civil and military government within the conquered territory. This was done, and duties were imposed and collected for the support of the government. These acts were held to be the lawful exercise of a belligerent right over conquered territory. Cross v. Harrison, 16 How., 164.

The same course was pursued when possession of New Mexico was held by the military authorities of the United States in 1846; a judicial system, composed of appellate and courts of original jurisdiction, was created, judges were appointed, and districts or circuits established; and this was held to be only the exercise of legitimate military power. Leitensdorfer v. Webb, 20 How., 176.

The following cases illustrate the general question included in this case: Fleming v. Page, 9 How., 614; Jecker v. Montgomery, 13 How., 515; United States v. Rice, 4 Wheat., 253; Coleman v. Tennessee, 97 U. S., 517; Ex Parte Milligan, 4 Wall., 141; Burke v. Tugee, 22 La. Ann., 629; Lanfear v. Mestier, 18 La. Ann., 497; Hopperman v. Porter, 6 Cold., 391; Scott v. Billgury, 40 Miss., 119; Chase's Decisions, 133.

Mr. Halleck makes a very full and clear statement of the powers which may be exercised by a government holding military possession of territory of a hostile State. Halleck's Laws of War, 775-809.

Conceding the broken relation of Texas to the United States during the war, the Supreme Court held, "that Texas continued to be a State, and a State of the Union, notwithstanding the transactions to which we have referred." Texas v. White, 7 Wall., 726.

But in view of this fact the Reconstruction Laws were maintained, and the necessity for them declared by Congress, in order to restore this proper relation under the changed conditions existing.

Under the facts existing, it was not for the people of Texas to determine when military rule should cease, or to what extent the administration of essentially civil affairs should be continued by military power. These were questions for the decision of the dominant power holding military possession; and whether decided correctly or not, that decision can not now be questioned. When private rights are concerned the courts must look to facts as they existed, and not to theories.

The condition of affairs, and the power of the military government, as exercised and understood to exist during the period referred to, is truly set forth in some of the opinions of the judges of the Supreme Court in this State holding under military appointment.

In Ex Parte Warren, 31 Texas, 144, it was said: "Our present State Government is provisional only in its character, and subject in all respects to the paramount authority of the United States. Being thus subject, and the act above referred to having been given us as a rule of action by the commander of the Fifth Military District, it would seem that there is no room left for doubt."

In another case, speaking of the power of a military Governor, it was

said, "that whatever he declared was, for the time being, law, being 'prescribed by the supreme power in the State.'   *   *   *   The orders issued by the commander of the Fifth Military District show that they exercised legislative power, and that this power was as full, ample, and complete as if it were exercised by a Senate and House of Representatives. The power exists, but the exercise of this power is by a different body; but still it is exercised by the supreme power in the State.  *  *  * This political power is not of a few months duration biennially, but like the executive,·continuous and always accessible." McClellan v. Shelby County, 32 Texas, 20, 21.

The judges of the Supreme Court appointed in July, 1870, by the Governor of the State elected by the people, while conceding that the courts then existing owed their existence to laws enacted by the people, seem to have been of the opinion that all officers then acting in the State derived their powers solely from the Acts of Congress before referred to, for it was said by that court: "We have no officer in any department of our present government chosen under the Constitution of 1869. The Governor, Lieutenant Governor, heads of departments, members of the Legislature, and local officers, all owe their official existence to the laws of Congress before referred to.  *   *   *   We have elected no Legislature, no Governor, no officer of any kind under it, but under the Reconstruction Acts we elected all these officers, expecting them to go forward and by necessary legislation organize a government under it (Constitution of 1869), and under the Constitution, laws, and treaties of the United States." Grant v. Chambers, 34 Texas, 584.

It was again stated by the same court, that they judicially knew that in 1869 "the government of the State of Texas was administered under the Reconstruction Laws, by the military authority; and that the orders from time to time issued by the military commander of the Fifth District had the force and validity of laws." Gates v. Johnson County, 36 Texas, 146.

We refer to these cases for the purpose of showing what was the practical construction given to the Reconstruction Acts, to the power of the officers acting under them, and of the powers which were exercised by reason of the military occupancy of the country.

Although. during the period of reconstruction there was a Supreme Court, District Courts, and County Courts, all exercising jurisdiction such as the Constitution of 1866 conferred on courts thus designated, still they were not organized and officered as that Constitution or any other law made by the people of Texas required them to be, but through the exercise of the military power then dominant; and as we have seen, this was exercised without restriction until April 16, 1870, and made to operate in some respects for a period extending until the last month of that year.

That the municipal laws of the State, in the main, were permitted to

be enforced in these tribunals in the determination of private rights, does not affect their character, nor make them other than provisional courts, acting under the authority of the United States, which had power and in fact did continue them in existence even after the time the State was permitted to have representation in Congress.

It is contended here, that when the Constitution of 1869 was adopted by the people it became the sole law, determining what courts should exist and what jurisdiction they should each exercise; and that as that instrument became operative early in December, 1869, when adopted by the vote of the people, and provided that probate jurisdiction should be exercised by District Courts, and not as theretofore by County Courts, all power of the latter court to exercise probate jurisdiction ceased.

In Peak v. Swindle, 68 Texas, 250, it was held, that the Constitution became operative in all its parts from the time it was ratified by the people. It was not, however, decided that except in so far as it assumed to regulate private rights, it was not in subordination to any other law.

The question in that case was as to the time statutes of limitation ran. In the course of the opinion it was said: " That Congress deemed the condition of the country such, at the time the Constitution was adopted, as to require continuance for a period thereafter of a provisional government, and to deny to the State a representation in Congress until it was satisfied that the Constitution was in harmony with that of the United States, and that the time had come when the provisional government should be withdrawn, is a matter of no consequence in the consideration of the question before us. Subject to the Constitution of the United States, laws made in pursuance thereof, and treaties made under the authority of the General Government, the Constitution under consideration became the supreme law of this State, regulating, so far as it assumed to do so, the rights of persons and property from the date of its adoption by the people."

The Constitution of 1869 was passed and adopted in pursuance of the acts of Congress looking to the restoration of that relation which had, before the war, existed between the United States and the State, and was as valid and binding a law, in so far as it purported to affect private rights, as were laws already existing and enforced through the military government.

That it might have been annulled so long as military rule continued, did not affect its force as a law regulating private rights any more than did the power to have annulled laws already existing affect their validity and force when not annulled.

The United States had the power to determine when the political relations formerly existing should be restored, and when the provisional government should cease and the several departments of the State Government become operative under the Constitution.

Occasion for the Reconstruction Acts grew out of the difference of opinion between the President and Congress of their respective rights and power to declare when the state of war ceased and when military government in the Southern States should end.

The President proclaimed the war to be at an end in Louisiana and some other States on April 2, 1866, and a like proclamation was made as to Texas on August 20 of same year.

Congress, dissenting from this view, assumed the right to determine when a state of war should be at an end in the several States theretofore in arms, and looking to the longer continuance of military government in each of them, the several acts of Congress before referred to were passed.

The substance of these acts, in so far as necessary to be stated, has already been given.

The military commanders required by those acts to be appointed were in effect the government until the reorganization of the State Government in 1870, and as before seen, some of their orders continued to operate for a much longer period.

As before stated, these military commanders and their appointees were relieved from obligation to govern their actions by the opinion of any civil officer of the United States, and they fully exercised all the powers conferred upon them by the law.

The military government, as before stated, was not proclaimed to be at an end until April 16, 1870, before which time all the acts transpired on which defendants rely for title.

Notwithstanding the act of Congress which looked to the termination of this government when the State was admitted to representation in Congress, in fact it continued in this State for sometime after that occurred, and the earliest period at which it can be claimed that County Courts ceased to have probate jurisdiction is the period at which the State Government was in operation under the Constitution of 1869.

In the case of Burke v. Miltenburger it was claimed that the provisional court established in New Orleans was ipso facto dissolved by the President's proclamation of April 2, 1866, declaring the war to be at an end in Louisiana.

It was said, that while the proclamation authorized the dissolution of the court, " it is plain to be seen, that its dissolution without proper provision for the business before it, as well as that which had been disposed of, would have produced serious injury; and this state of things, requiring the action of Congress, was doubtless recognized by the President, as nothing is said in the proclamation about this court. If it was subject to be dissolved as soon as the proclamation appeared, and was no longer a court de jure, it still had a de facto existence until its actual dissolution."

It is claimed, that while there may be a de facto officer, there can be neither a de facto court nor a de facto office.

The opinion last noticed decides to the contrary.

When, under the order of the President, courts were organized within territory of States held by military force, or when under like circumstances they were organized under the Reconstruction Acts, it must be held that such courts were de jure.

If continued in existence beyond the time the laws of war would sanction or the acts of Congress justify, in the determination of private rights dependent upon and growing out of their action, the plainest principles of justice require that they should be deemed de facto, and their judgments and decrees binding.

In Hildreth's Heirs v. McIntire's Devisees, 1 J. J. Marshall, 208, the rule and reason for the rule is thus fairly stated: "When the government is entirely revolutionized, and all its departments usurped by force or the will of the majority, then prudence recommends and necessity enforces obedience to the authority of those who may act as the public functionaries; and in such a case the acts of a de facto executive, a de facto judiciary, and a de facto Legislature must be recognized as valid. But this is required by political necessity. There is no government in action excepting the government de facto; because all the attributes of sovereignty have, by usurpation, been transferred from those who have been legally invested with them, to others who, sustained by a power above the powers of law, claim to act and do act in their stead."

In Trevino v. Fernandez, 13 Texas, 630, it was held, that a decree of a Mexican court, if final in its nature, vesting title in a party before it to a tract of land on this side of the Rio Grande within the limits of the State of Texas, as defined by the political authorities, must be respected if in fact that government was in hostile possession of the territory in which the land was up to and at the date of the decree. After noticing several authorities, this court said: "From these authorities it is manifest that the acts of the government in actual possession, in the ordinary administration of its laws, so far as they affect private rights, are valid, and can be set up to support an action or defend a right. Those affecting public rights are void, and can not be enforced."

In Keene v. McDonough, 8 Peters, 308, it appeared that a party claimed a tract of land under a sale made under a decree of a Spanish court after the territory embracing the land had been ceded by Spain to the United States, but before actual possession was taken by the latter government. It was held, that "The adjudication having been made by a Spanish tribunal after the cession of the country to the United States, does not make it void; for we know historically that the actual possession of the territory was not surrendered until sometime after these proceedings took place. It was the judgment, therefore, of a competent Spanish

tribunal, having jurisdiction of the case, and rendered whilst the country, although ceded, was, de facto, in the possession of Spain and subject to Spanish laws.   Such judgments, so far as they affect the private rights of the parties thereto, must be deemed valid.''

These cases serve to illustrate a rule which should be held of universal application in the determination of private rights.

Holding as we do, that the County Court had jurisdiction to order and confirm the sale of the lot, the judgment of the Court of Civil Appeals will be reversed and the judgment of the District Court affirmed.

It is so ordered.

*Affirmed.*

Delivered June 22, 1893.