FIELDER et al. v. HOUSTON OIL CO. OF
TEXAS et al.†

(Court of Civil Appeals of Texas. Galveston.
Jan. 21, 1914. On Appellants' Motion for
Rehearing, Feb. 19, 1914. Appellees' Motion
for Rehearing Denied March 5, 1914.)

1. PUBLIC LANDS (§ 175*)—LOCATION—CON-
FLICTING LOCATIONS.
Under Const. 1869, art. 10, § 3, providing
that the location of land certificates, made sub-
sequent to October 30, 1856, shall be void when
made upon land previously titled, and the pres-
ent Constitution (article 14, § 2), providing that
all genuine land certificates shall be located only
upon vacant public domain, and not upon any
land titled or equitably owned under color of
title from the state, evidence of the appropria-
tion of which is on the county records or in the
General Land Office, a mere apparent conflict
shown upon an inaccurate map or by erroneous
certificates of survey will not invalidate a subse-
quent location, if there is no actual conflict on
the ground.
[Ed. Note.—For other cases, see Public
Lands, Cent. Dig. §§ 555–570; Dec. Dig. §
175.*]

2. PUBLIC LANDS (§ 175*)—LOCATION—SUS-
PENSION OF LOCATION—"CLOSE OF THE
WAR."
6 Gam. Laws, p. 669, approved December
14, 1863, provided that until six months "after
the close of the present war" all laws authorizing
the location, survey, or sale of any public land
except as therein provided for are hereby sus-
pended. That act was repealed by Act Oct. 20,
1866 (Acts 11th Leg. c. 44). Held that the "close
of the war" would be dated, for the purposes
of the statute from May, 1865, when the war
actually closed in Texas, and not from August
20, 1866, when the President issued a proclama-
tion declaring the war closed in Texas.
[Ed. Note.—For other cases, see Public
Lands, Cent. Dig. §§ 555–570; Dec. Dig. §
175.*]

3. EVIDENCE (§ 11*)—JUDICIAL NOTICE—HIS-
TORICAL FACTS—CLOSE OF CIVIL WAR.
The Court of Civil Appeals knows as a
matter of history that the Civil War actually
closed in Texas in May, 1865, when the Confed-
erate forces surrendered to the federal gov-
ernment.
[Ed. Note.—For other cases, see Evidence,
Cent. Dig. §§ 15, 16; Dec. Dig. § 11.*]

4. STATUTES (§ 219*)—CONSTRUCTION—AD-
MINISTRATIVE CONSTRUCTION.
An interpretation placed upon a statute by
administrative officers, and consistently followed
for a number of years, is entitled to much weight
in construing the statute.
[Ed. Note.—For other cases, see Statutes,
Cent. Dig. §§ 296, 297; Dec. Dig. § 219.*]

5. STATUTES (§ 220*)—LEGISLATIVE CON-
STRUCTION.
The interpretation placed by one Legisla-
ture upon a statute enacted by another cannot
be given controlling effect by the court in con-
struing the statute.
[Ed. Note.—For other cases, see Statutes,
Cent. Dig. § 298; Dec. Dig. § 220.*]

6. ADVERSE POSSESSION (§ 31*)—SUFFICIENCY
OF POSSESSION.
The actual possession of 15 or 20 acres of
a 160-acre tract cannot, as a matter of law,
be held insufficient to give notice to the owner
of the 160 acres that the person in possession
was claiming a part of it, though the latter sup-
posed when he first went upon the land that it

was vacant public land, where he continued to
claim the land after learning that it was not.
[Ed. Note.—For other cases, see Adverse Pos-
session, Cent. Dig. §§ 128–133; Dec. Dig. §
31.*]

7. LIS PENDENS (§ 24*) — APPLICATION OF
DOCTRINE.
The doctrine of lis pendens only applies to
one who purchased from defendant after service
of citation.
[Ed. Note.—For other cases, see Lis Pen-
dens, Cent. Dig. §§ 38–40, 42–46; Dec. Dig. §
24.*]

On Motion for Rehearing.

8. STATUTES (§ 167*)—REPEAL.
Section 4 of the act adopting the Revised
Civil Statutes of 1895 (Rev. St. 1895, p. 1103)
provides that all civil statutes of a general na-
ture in force when the Revised Statutes took ef-
fect, and not included therein, or not expressly
continued in force, were thereby repealed, but
section 7 provides that no general or special law,
validating or legalizing the acts or omissions of
any officer or any act whatever, should be affect-
ed by the repealing clause, but all validating
statutes were thereby continued in force. Held
that section 7 continued in force Act April,
1871, providing that all surveys, properly made
by virtue of a valid land certificate, not in con-
flict with any valid claim, should be deemed val-
id, and patents should be issued thereon, though
the act of 1871 (Acts 12th Leg. c. 56) was
omitted from the Revised Statutes of 1895.
[Ed. Note.—For other cases, see Statutes,
Cent. Dig. §§ 242, 243; Dec. Dig. § 167.*]

9. PUBLIC LANDS (§ 175*)—SURVEYS—SUS-
PENSION OF LOCATION—"LOCATIONS PROPER-
LY MADE."
Under Act April, 1871 (Acts 12th Leg. c.
56), providing that all surveys, properly made
by virtue of genuine or valid land certificates,
which surveys, with the certificates, were on
file in the General Land Office and not in con-
flict with any valid land claim, should be deem-
ed valid and patents should be issued for same,
did not validate a location made without legal
authority, as at a time when the laws authoriz-
ing locations of public land were suspended by
statute; the clause "locations properly made"
meaning locations made by authority of law.
[Ed. Note.—For other cases, see Public
Lands, Cent. Dig. §§ 555–570; Dec. Dig. §
175.*]

Appeal from District Court, Hardin Coun-
ty; L. B. Hightower, Judge.

Action by Alice C. Fielder and others
against the Houston Oil Company of Texas
and others. From a judgment for defend-
ants, plaintiffs appeal. Affirmed in part,
and reversed and remanded in part.

John Hamman, of Houston, and Oliver J.
Todd, of Beaumont, for appellants. High-
tower, Orgain & Butler and W. D. Gordon,
all of Houston, and Minor & Minor, of Beau-
mont, for appellees.

PLEASANTS, C. J. This is an action of
trespass to try title, brought by appellants
against the appellees, to recover a survey of
480 acres of land in Hardin county located
and surveyed by virtue of bounty warrant
No. 67, issued by the Republic of Texas to
John Lewis. The suit was originally against
a number of defendants, but plaintiffs before
the trial dismissed as to all the defendants
except the appellees Houston Oil Company,

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

† Writ of error granted by Supreme Court.

R. H. Kirby, and R. S. Stephens. The Houston Oil Company answered by general demurrer and plea of not guilty, and by pleas of limitation of three, five, and ten years, and plea of stale demand. R. H. Kirby filed a like answer. The defendant R. S. Stephens disclaimed as to all of the land except a tract of 160 acres described in his answer, as to which he pleaded not guilty and limitation of three, five, and ten years. The trial in the court below without a jury resulted in a judgment in favor of all of the defendants.

The evidence shows that the bounty warrant issued to John Lewis was legally issued and was a valid and genuine land warrant. It was assigned by John Lewis to Joel Burt on November 6, 1857. Appellants are the heirs of said Burt. This warrant was located on the land in controversy on July 21, 1866, and, together with the field notes of said survey, was returned to the General Land Office on August 1, 1866. In these field notes the distance of the ninth course in the calls was omitted, and they were returned to the surveyor for correction. This correction was made on May 16, 1867, and the corrected field notes returned to the General Land Office and filed therein on June 7, 1867. This location was made upon vacant and unappropriated public land, but from the map on file in the Land Office at that time showing the location of the Lemuel Watson and Maria Zimines grants, both of which were then titled, the John Lewis was embraced in said grants. The map of Hardin county in 1841 also shows that the Watson survey and the T. C. Gaines survey, which was also titled at the time the Lewis location was made, conflict with said location. The trial judge in his conclusions of fact expressly finds "that at the time the John Lewis survey was located and surveyed upon the ground, same was not in conflict with any prior survey on the ground." The evidence fully sustains this finding.

The court further found that the defendant Stephens and those under whom he claims had held peaceable and adverse possession of the 160 acres claimed by said defendant for more than 10 years before this suit was brought "residing upon, using, cultivating, and enjoying the same." The evidence sustains this finding, and shows that such possession was continuous and under a claim of right, and was actual and visible as to a portion of said 160 acres.

It appears from the record that the General Land Office for a number of years regarded the John Lewis location void because from the Land Office maps it was apparently covered by prior locations, and for this reason the Lewis survey was not patented. It seems, however, that in 1870 the surveyor from whose survey and field notes the location of the Maria Zimines grant was fixed on the Land Office map certified to the Land Office that his former certificate showing the

165 S.W.—4

location of said grant was incorrect, and that he did not know where said grant was located. Subsequently the Lewis location was covered by locations made in the names of R. C. Crane and Mary Hopkins, and patents were issued on said locations on December 9, 1901, and December 4, 1901, respectively. The appellees claim title under these patents. The trial court held that the Lewis location was void upon two grounds: First. Because at the time it was made the Civil War had not been closed for six months, and under the act of December 14, 1863 (5 Gam. Laws, 669), which was then in force, such location was unauthorized. Second. Because such location was, according to the maps and data of evidence then in the General Land Office, in conflict with older locations, and this rendered the Lewis location void, notwithstanding the fact that it did not actually conflict on the ground with any older location.

[1] We think neither of these conclusions is sound. Taking up the propositions in the reverse order in which they are stated, it seems clear to us that to render a location void because in conflict with an older location, there must be an actual conflict on the ground, and not merely an apparent conflict, shown upon an inaccurate map or by erroneous certificates of survey. The Texas Constitution of 1869 (article 10, § 3) declares, in substance, that the location of all land certificates made subsequent to October 30, 1856, shall be held void when made upon land previously titled. Manifestly a location of a valid land certificate could not be held void under this constitutional provision unless such location actually conflicted with a prior grant. Unless the land covered by the location was actually included within the boundaries of a previous grant, such location would not be upon land previously titled. Section 2, art. 14, of the present Constitution of this state contains the following provisions: "Provided, that all genuine land certificates heretofore or hereafter issued shall be located, surveyed or patented, only upon vacant and unappropriated public domain, and not upon any land titled or equitably owned under color of title from the sovereignty of the state, evidence of the appropriation of which is on the county records or in the General Land Office; or when the appropriation is evidenced by the occupancy of the owner, or of some person holding for him." The inhibition in this provision of the Constitution is against locating or patenting "land titled or equitably owned under title or color of title from the sovereignty of the state." The clause "evidence of appropriation of which is on the county records or in the General Land Office" is a limitation upon the inhibition, in that it qualifies the clause "land titled or equitably owned under color of title from the sovereignty of the state." There must have been a prior location on the ground held under title

or color of title from the state, and such prior appropriation must be evidenced by the records of the county, or of the General Land Office, or by occupancy. A prior location not evidenced as required would not defeat a junior location, and we think it goes without saying that, unless there was a prior location actually made on the ground, a map or other record, erroneously showing such location, would not defeat the right of one who had actually made the first survey and location on the land.

[2] The other conclusion of the trial judge before stated presents a question more difficult of decision. By an act of the Legislature of this state approved December 14, 1863, it was provided "that until six months after the close of the present war all laws authorizing the location, survey or sale of any public land or land script, except in cases herein provided for, are hereby suspended." 6 Gam. Laws, 669. The exceptions mentioned in this act do not include bounty warrant locations like that under which appellants claim; and, if this act was in force at the time said location was made, the validity of the location depends upon whether in the purview of this statute the war between the states had closed six months before July 21, 1866, the date said location was made. The learned trial judge held "that the Civil War did not close until it was declared closed by the proclamation of the President of the United States promulgated on August 20, 1866, declaring it closed on that date as to Texas." In support of this conclusion the court cites the following cases: The Protector, 12 Wall. 700, 20 L. Ed. 463; Adger v. Alston, 15 Wall. 555, 21 L. Ed. 234; Lamar v. Browne, 92 U. S. 187, 23 L. Ed. 650, and other cases cited in 7 Rose's Notes, U. S. Rep. 587, and also the cases of Grigsby v. Peak, 57 Tex. 142, Hargrove v. De Lisle, 32 Tex. 170, and Daniel v. Hutcheson, 86 Tex. 51, 22 S. W. 933. In none of the cases cited was the statute above set out under consideration, and we do not think the holding in these cases that the date of the President's proclamation, August 20, 1866, declaring the war in Texas closed, should be taken as the date on which the war closed is controlling in construing the statute in question.

[3] We know as a matter of history that the war actually closed in this state in May, 1865, when the forces which had theretofore been resisting the authority of the federal government surrendered. There was no actual war after that time, no conflict carried on by force. So far as the people and government of this state were concerned the war then ceased, and it was never resumed. Nichols v. State, 30 Tex. 516; Clark v. State, 31 Tex. 576; Daniel v. Hutcheson, 86 Tex. 51, 22 S. W. 933.

The manifest purpose and intent of the act was to withdraw the public lands from location and sale while so many of those having a right to purchase or to locate land warrants were engaged in fighting the battles of the state, and for that reason were deprived of the opportunity to exercise such right. Fairness to those so engaged required the suspension of the laws authorizing the location and sale of the public lands in order that the most valuable and desirable of the lands could not be acquired by others who were not serving the state as soldiers. When the war actually ceased and the soldiers had all returned to their homes, the purpose of the act had been accomplished, and we think it would be unreasonable to hold that the Legislature in passing this act intended that the suspension of the laws authorizing the survey and location of the public lands should continue longer than six months after the actual close of the war, a sufficient time to give all of those engaged in the war time to return to their homes and resume their usual avocations, and thus secure to them an equal opportunity in selecting and locating upon the public lands.

It may be well enough for some purposes to take the date of the President's proclamation as the date of the close of the war, but to fix that as the date upon which the war should be deemed closed as contemplated by the Legislature in enacting this statute is to extend its operation further than necessary for the accomplishment of its evident purpose, and to give it an effect not contemplated in its enactment. The General Land Office did not question the validity of this location on the ground that it was made within less than six months after the close of the war, and was for that reason prohibited by the statute before quoted. The record shows that the validity of other locations made at this time was recognized and patents issued thereon. We know that peace had prevailed in this state for more than a year before this location was made, and that all of the departments of the state government were in full operation. To what extent locations were made upon the public lands during the period from six months after the close of the war to six months after the proclamation of the President, declaring it closed as to Texas, is not shown, but it is reasonable to presume that a number were made during that time, and we are unwilling to arbitrarily adopt the date of the President's proclamation as the date of the close of the war, when by so doing we would probably invalidate many titles in this state the validity of which has never been questioned.

[4] The interpretation placed upon the statute by the officers immediately charged with its administration and consistently followed by their successors is entitled to much weight; and, except for a notation appearing upon the file of the papers in the Land Office in regard to this location, made long subsequent to the location in question by some clerk, where authority is not shown, it does not appear that the legality of this location was ever questioned by the Gen-

eral Land Office on the ground that the laws authorizing locations on public lands were suspended at the time said location was made.

In May, 1905, the Commissioner of the General Land Office addressed a letter to the Attorney General, asking to be advised whether or not a patent should issue on this location. In this letter the Commissioner makes the following statements: "In 1866 a bounty warrant and field notes in the name of John Lewis for 480 acres in Hardin county were returned to and filed in this office. The survey was platted on the map but was for some cause now unknown omitted from subsequent maps and apparently lost sight of until within the last year or two, when the omission was discovered and the survey again placed on the map. This claim is considered by this department valid in every respect, and patent could be issued thereon so far as its regularity is concerned. However, subsequent to its location there were other locations made in the same territory and patented; it is also partly on what is known as the Maria Zimines titled grant along which there is considerable confusion as to its location. After stating that it is now and has been since the establishment of this department, so far as I am advised, the uniform custom of the office to never knowingly issue one patent to individual land upon another tract of patented individual land, I will ask you to advise me whether or not I shall now issue a patent on the John Lewis survey." The statement, above quoted, that the survey had been dropped from the map and lost sight of until a few years previous to the date of the letter probably accounts for the fact that when it was discovered that the land covered by said location was not in conflict with previous surveys, the land was patented to junior locators instead of patent issuing on the Lewis location. At any rate it appears from this letter that the patent had not been, and was not then, withheld because of any supposed invalidity growing out of the date of the location. No question as to the validity of the Lewis location being presented by this letter, that question was not passed upon by the Attorney General's office, but the land Commissioner was advised, in substance, that unless the location conflicted with a prior survey, patent should issue thereon under article 4176, Revised Statutes of 1895, notwithstanding the fact that patents for said land had theretofore been issued upon locations made subsequent to the Lewis location.

[5] The trial judge and counsel for appellees cite the act of October 20, 1866 (Laws 1866, c. 44), repealing the act of December 14, 1863, suspending all laws authorizing locations on public lands, in support of the proposition that said suspending act was in force at that time, which was several months after the location in question was made. We do not think that the fact that the Legislature repealed the suspension act after the location in question was made is entitled to much force in determining whether said act was in effect at the time the location was made. The suspension act being upon the statute, and the Legislature knowing that it had accomplished its purpose, and not unlikely thinking that some question as to its continued effectiveness might arise, may, for these reasons, have deemed it best to repeal it. But it is not material what motive actuated the repeal. This was not the Legislature which passed the suspension act, and the interpretation placed by one Legislature upon the act of another cannot be given controlling effect in construing such act.

In April, 1871, the Legislature passed an act (Laws 1871, c. 56) containing the following provisions: "All surveys, properly made, by virtue of genuine or valid land certificates, which surveys, together with the certificates by virtue of which they were made, have been returned and are now on file in the General Land Office, and not in conflict with any valid land claim, shall be deemed valid, and the Commissioner of the General Land Office is hereby authorized and required to issue patents for the same." This act appears in Paschal's Digest as article 7089, and was carried forward in the Revised Statutes of 1879. It was omitted from the Revised Statutes of 1895 by report of the joint committee of the Legislature on amendments to the Revised Civil Code, and is not now a part of the statutes of this state. Vide Note art. 4157, Sayles' Civil Statutes. We do not deem it necessary to determine whether or not this act, if in force, would have the effect of validating a location made during the time that the laws authorizing locations upon public lands were suspended. The case of Adams v. Ry. Co., 70 Tex. 276, 7 S. W. 729, leaves the question in doubt. We are of opinion, however, that if appellants' contention that said act was intended to validate locations made at a time not authorized by law is correct, it cannot now have any effect upon the question of the validity of the Lewis location, because it is not now in force, and nothing was done by the holders of the Lewis claim during the time the act was in force by which they acquired any vested rights thereunder. They are in the same position now in regard to the question of the validity of the location as before the passage of the validating act.

[6] There is no merit in appellants' assignments of error complaining of the judgment of the trial court awarding the defendant Stephens the 160 acres of the land claimed by him under his plea of limitation. The actual possession of Henry Teel, the predecessor in title of appellee Stephens, of 15 or 20 acres of the 160 acres claimed by him cannot be held, as a matter of law, to have been a mere encroachment, and insufficient to give notice to the owner of the 160 acres that

Teel was claiming a portion of his land. Smith v. Jones, 103 Tex. 632, 132 S. W. 469, 31 L. R. A. (N. S.) 153. The fact that when Teel went upon the land he supposed it was vacant public land, and intended to acquire it from the state, in no way affected the adverse character of his possession and claim to the land after he discovered that it was not vacant public land, and the evidence shows that the adverse possession continued after such time for more than 10 years.

[7] It appears from the record that in a suit against F. M. Yost et al., filed in the district court of Taylor county on August 26, 1902, F. N. Brown, on March 8, 1905, recovered a judgment against Henry Teel for 192 acres of land, which included the 160 acres claimed by the defendant Stephens under his plea of limitation, and which was purchased by him from Teel on February 5, 1903. Appellants contend that under these facts appellee Stephens is not entitled to recover on his plea of limitation, because, having purchased from Teel during the pendency of the suit before mentioned, he is bound by the judgment therein, and any title which Teel may have had to the land is outstanding in F. N. Brown, and such outstanding title, being a title by limitation, could not be available as a defense because not pleaded. Miller v. Gist, 91 Tex. 335, 43 S. W. 263. We think it clear that the facts before stated are not sufficient to show that Stephens was a purchaser lis pendens and therefore bound by the judgment rendered against Teel. The doctrine of lis pendens only applies to one who purchased from the defendant after service of citation in the suit. It is not shown when Teel was made a party to the suit, nor that he had been served with citation prior to the time he conveyed the land to Stephens. This being the extent of the evidence, Stephens cannot be held to be a lis pendens purchaser. Humphrey v. Beaumont Irrigation Co., 41 Tex. Civ. App. 308, 93 S. W. 180.

What we have said disposes of all the material questions presented by the appeal. We are of opinion that the judgment in favor of appellee Stephens for the 160 acres claimed by him should be affirmed, and as to the remainder of the tract claimed by appellants, the judgment of the court below should be reversed, and judgment here rendered in favor of appellants, and it is so ordered.

Affirmed in part.

Reversed and rendered in part.

## On Appellants' Motion for Rehearing.

[8] In our main opinion in this case heretofore filed we erred in stating that the validating act of 1871, quoted in said opinion, was repealed by being omitted from the Revised Statutes of 1895. We were led into this error by the note in Sayles' Civil Statutes, cited in the opinion. Section 4 of the act adopting the Revised Civil Statutes of 1895 (Rev. St. 1895, p. 1103) provides "that all civil statutes of a general nature, in force when the Revised Statutes take effect, and which are not included herein, or which are not expressly continued in force, are hereby repealed." Under this provision the validating or curative act before mentioned would be repealed, but section 7 of the act adopting the Revised Statutes exempts validating acts from the operation of section 4, before quoted. Section 7 is as follows: "That no general or special law heretofore enacted validating or legalizing the acts or omissions of any officer, or any act or proceeding whatever, shall be affected by the repealing clause of this title; but all such validating or legalizing statutes whatsoever now in force in this state are hereby continued in force, and the same shall be as effectual for all purposes after as before the Revised Statutes go into effect." Under this provision, which is also contained in the act adopting the Revised Statutes of 1911, it is clear that the validating act of April, 1871, which provides that "all surveys properly made by virtue of genuine or valid land certificates, which surveys, together with the certificates by virtue of which they were made, have been returned and are not on file in the General Land Office and not in conflict with any valid land claim, shall be deemed valid and the Commissioner of the General Land Office is hereby authorized and required to issue patents for the same," is still in force. The evident purpose and intent of the Legislature in the enactment of section 7 above quoted was to preserve unimpaired any rights which might have accrued to any person under the provisions of any validating act in force at the time the Revised Statutes took effect, and the statement in our former opinion that appellants cannot assert any rights under said act is incorrect, and is withdrawn.

[9] This being so, it is necessary for us to determine whether said validating act had the effect of legalizing a location on public lands, made at a time when the laws authorizing such location were suspended. As stated in our former opinion, the question is not free from doubt. The clause "all surveys properly made" must be held to only mean all surveys accurately or properly made as to running and locating the lines of the survey and their designation in the field notes, if the act is made to apply to a location not authorized to be made by law. On the other hand, if the survey was "properly made" in the sense that it was made in accordance with law, it can plausibly be contended that no validating act was necessary, as any discrepancies in the location of its lines or in the field notes returned to the Land Office might, under the law, have been corrected, and therefore the Legislature in the passage of said act was

engaged in a wholly unnecessary and useless task.

In the case of Adams v. Ry. Co., 70 Tex. 252, 7 S. W. 729, our Supreme Court, in an exhaustive opinion by Justice Stayton, construes this and other acts regulating the location and survey of public lands and, as we understand the opinion, reaches the conclusion that the purpose of this act was to validate locations in which the surveys had not been made and the field notes returned to the Land Office within the time fixed by previous statutes. In other words, the purpose was to prevent the forfeiture of a right legally acquired, and not to validate an unauthorized attempt to acquire a right. This being the purpose of the act, we think the clause "locations properly made" should be construed to mean locations made by authority of law, and the act would not validate a location made without any legal authorization, or at a time when the laws authorizing such locations were suspended.

With this correction and addition we adhere to the views expressed in our former opinion and the motion for rehearing is overruled.