## O'KEEFFE v. WERTHMANN et al.
### No. 2521.

Court of Civil Appeals of Texas. El Paso.
April 9, 1931.

Rehearing Denied May 7, 1931.

Kemp & Nagle, of El Paso, for appellant.

C. W. Croom and D. E. Mulcahy, Co. Atty., both of El Paso, for appellees.

HIGGINS, J.

This is a suit filed February 17, 1930, by Thomas O'Keeffe, against John, and Charles Werthmann, and others not necessary to mention, to recover a small diamond-shaped tract of land, a part of the Simeon Hart pre-emption survey No. 2, in El Paso county. The land is described in the petition as follows:

"Being a strip of land about 152 feet in width off of the south end of that certain tract of land out of the Simeon Hart Preemption Survey No. 2 conveyed to the said Thomas O'Keeffe by Thomas F. Davis, individually and as executor of the last will and testament of Juan S. Hart, Deceased, and as attorney in fact for other parties, by deed dated March 25, 1921, recorded in Book 510, on page 491, records of deeds of El Paso County, Texas, and more particularly described as follows, to-wit:

"Beginning at the south corner of said tract of land so conveyed to the said Thomas O'Keeffe as aforesaid, on the northeast bank of the Rio Grande, the same being the southwest corner of the Old Fort Bliss Military Reservation; thence north with the east line of said survey so conveyed, and the west line of the old Fort Bliss Military Reservation about 185 feet to the south line of Doniphan Drive, the same being the present County road which is about 30 feet in width; thence in a northwesterly direction with the south line

of said Doniphan Drive, the same being the present County road (which County is now seeking to broaden) 152 feet; thence due south to the north bank of the Rio Grande; thence in a southeasterly direction with the north bank of the Rio Grande to the place of beginning."

The Werthmanns pleaded not guilty, the ten years' statute of limitations, and valuable improvements made in good faith.

As to the record title, the issue is one of boundary. The boundary issue is as to the location of the west line of the Old Fort Bliss Military Reservation. The Werthmanns claim that such line is coincident with the northwest line of the land sued for being the line marked C–D on the drawing below.

O'Keeffe claims that the reservation line is the southeast line of the disputed tract marked A–B on such drawing.

The situation is sufficiently illustrated by this crude drawing:

These issues were submitted:

"Question No. One: Do you find from a preponderance of the evidence that the tract of land described in plaintiff's petition is enclosed within the boundaries set forth in the deed from the Juan Hart heirs to. Thomas O'Keeffe, said deed dated 25th day of March, 1921?

"Question No. Two: Do you find from a preponderance of the evidence that the defendants, either in person or in connection with their father under whom they claim, had peaceable and adverse possession of the land in controversy, using or enjoying the same for any period of ten years before the filing of this suit on the 17th day of February, 1930?"

In connection with the second question, definitions of the terms "peaceable possession" and "adverse possession" were given.

The first question was answered "No," the second, "They have."

The issues relating to improvements were conditionally submitted and were not answered.

Error is assigned to the submission of the first issue upon the ground that the uncontroverted evidence shows that the land described in the petition is inclosed within the boundaries set forth in the deed from the Juan Hart heirs to Thomas O'Keeffe of date March 25, 1921.

The agreed statement of facts does not disclose the boundaries of the deed mentioned. As to that deed it simply shows plaintiff introduced same in evidence, "said deed conveying the property described in plaintiff's petition."

In the state of the record it is thus an uncontroverted fact that the land described in the petition is inclosed within the boundaries of the deed mentioned. The judgment cannot be sustained upon the first finding.

■ Passing to the issue of limitation the evidence clearly supports the second finding.

The Werthmanns claim under their father, Joseph Werthmann, who died in 1914. The father purchased from John O'Keeffe, a brother of the plaintiff. The land conveyed was described by lot numbers, the most northerly lot being No. 17, and the claim of the defendants is that the land in controversy is embraced in that lot. The deed to the father is dated October 15, 1913, filed for record October 15, 1913. On the date last mentioned he conveyed to Frank Foster. By deed of February 27, 1914, filed for record March 21, 1914, Foster reconveyed to the father of the defendants.

In 1914 the defendants Werthmann built a house on the land in controversy; another about 1916; and a filling station and garage in 1921. The first house is built wholly upon the land in dispute. So are the filling station and garage. The 1916 house is wholly on the land, except the east corner which projects slightly across the southeast line of the land in dispute. For the houses built in 1914 and 1916 the Werthmanns applied for and obtained building permits from the city of El Paso. The pertinency of this arises from the fact that the west line of the city of El Paso is the west line of the Old Fort Bliss Military Reservation, and, if that line is where defendants assert it to be, the land in dispute lies in the city of El Paso, and building permits were necessary.

Joe Werthmann, a bachelor, has lived continuously in the house first built to the present time.

With his family, Charles Werthmann has lived continuously in the 1916 house to date. Their possession of these houses has certainly been adverse. Appellant makes no point as to these facts, but contends that the disputed area was not fenced, and under the so-called encroachment doctrine appellees cannot maintain their limitation title except as to the land actually in their possession.

Appellant's position is disclosed by two special charges requested by him and refused by the court. They read:

"In connection with special issue No. two submitted to you by the Court, you are instructed that to constitute peaceable and adverse possession of the premises described by plaintiff in his petition, that it will be necessary for the defendants, Werthmanns, to have possession of all said premises, and it would not be sufficient merely to occupy and use building erected thereon, though they were erected continuously for a period of ten years before the filing of the suit, but it would be necessary to constitute continuous, peaceable and adverse possession thereof that said entire premises described in plaintiff's petition be continuously enclosed for a period of ten years before the filing of the suit."

No. 3: "You are instructed in connection with Question No. 2 submitted to you by the Court, to constitute peaceable and adverse possession, as therein defined, it would be necessary for the defendants, Werthmann, or their father, to continuously have possession of the entire premises described in plaintiff's petition for a period of ten years next before the filing of the case, and during said period of ten years to continuously use, occupy and enjoy said entire premises and the use, occupation and enjoyment of a part thereof would not be sufficient."

In our opinion the doctrine of encroachment which has been often applied in this state has no application to the facts disclosed by this record. Some of the cases applying the doctrine and here cited by appellant are Bracken v. Jones, 63 Tex. 187; Titel v. Garland, 99 Tex. 201, 87 S. W. 1152; Houston Oil Co. v. Holland (Tex. Com. App.) 222 S. W. 546; Carley v. Parton, 75 Tex. 98, 12 S. W. 950; Smith v. Lumber Co. (Tex. Civ. App.) 242 S. W. 767, 770; Bailey v. Kirby Lumber Co. (Tex. Civ. App.) 195 S. W. 221, 229; Fielder v. Houston Oil Co. (Tex. Com. App.) 208 S. W. 158. Examination of these cases and others applying the rule invoked by appellant will

disclose a state of facts radically different from that here shown.

As said by Judge Williams in Smith v. Jones, 103 Tex. 632, 132 S. W. 469, 470, 31 L. R. A. (N. S.) 153, in discussing the doctrine: "It must be kept constantly in mind that, in applying a proposition like that, the facts of particular cases must be carefully regarded, and that additional facts may easily take the question, whether or not the evidences of possession and adverse claim were sufficiently certain and unequivocal to give notice to reasonably diligent owners, out of the province of the court and into that of the jury."

Charles Werthmann testified:

"Joseph Werthmann was my father. There is a monument out there where we live, and that same monument was there when we bought the property. Mr. John O'Keefe showed me that monument. He is the man from whom my father bought the property. We put our improvements right there opposite where the monument was, on that side of the monument. That monument was there on the ground when we bought it sixteen years ago. The river lies to the rear of that property, the Rio Grande River. The street car track lies on the northern part of that property, and the pavement, called Doniphan Drive. I fenced about four hundred feet of that property on the road, beginning at the monument. That fence extended three-fourths of the way around that property. My father died in 1914. He left no children besides John and I. This fence was put around this property in 1913 before my father died. My brother and I built the fence with the help of a man. There was a wooden fence in front, and wire fence in back. The picket wooden fence in front is still standing. I put three houses on the property. I started the first house there in 1913, and completed it in 1914. There was a four room house, which I live in. That house is about fifteen or twenty feet from this monument. That house is there now. I built another house there in 1916, after my brother married. I think that took me about nine months, it was completed sometime in 1916 and my brother moved into it. He has a family. He is living right there on the property now. He has two boys, and one girl. He has been living in the house since 1916. We also built a garage there. The garage is north of the monument. Mr. Thomas O'Keefe never put any improvements on that property that I know of, and no one else. I have made it my home continuously, and am still living there. I have a few chickens there but no cows. I had a cow and horse years ago. I kept the horse right in the pasture on the north side. I had a corral there. I built a little house there in 1913, and another one in 1916. I put the fence up in 1913. I started the garage in 1919 and finished it in 1921. In 1917 and 1918 I was overseas. My brother stayed here, he did not get to go over. I have been occupying the place there ever since. I have been paying taxes on it and have got the tax receipts right here. The record will show that John O'Keefe, brother of the plaintiff in this case, deeded to my father the lots described in this map shown to the jury by deed of date October 25th, 1913, and recorded the same date. Mr. John O'Keefe showed that property to me and my father at or about that date. They got off the street car, I was waiting for them, we walked down the road, they started right from that call, twenty-five feet right from here, and walked clean down to the monument, the only monument there at that time, and it is still there. That is where John O'Keefe told us the property went to. Before we put our improvements on there we had it surveyed. * * *

"When my father and Mr. O'Keefe came there, as I stated a while ago, I was waiting for them at the old stable—where the old stables used to be, still standing there. The stables were at the corner where my property starts, the south corner toward town. I was down there. I waited down there next to town until my father and Mr. John O'Keefe came there. I heard the conversation between Mr. John O'Keefe and my father. They got off the street car right at that old stable, and that is where he told my father. He said the property ran from there on down to the monument. We all three went down to the monument together. I was under the impression that this property was in the city limits. I received tax receipts from the city and county both. I did not know where the city limit was. I paid for the taxes in the city limits. The first house we put in was nearest to the smelter, and is standing there today. That is the one I built in 1913. I built four houses there all told. I constructed the last house in 1927. That is not on disputed property. There were two four room houses. The house I built in 1916 is the house nearest to town. I got a city permit for the first house that I built. I got that permit in 1913. I came here to the City of El Paso, went over to the city hall and got a permit to build the house, representing that it was in the city limits of the city of El Paso. I was under the impression that it was at the time. * * *

"I can show you on that map where that fence was that I put there in 1913. It says North, at 45 angle, right about 800 feet back of the house, from the front north point about 800 feet more or less. Some of it is still standing. The fence went clean back to where that camp ground was. I built the camp ground about eight hundred feet back, I think; back six hundred feet from the point, the north point of my land, going toward town. The fence went along the county road and then down to the river. I did not have any fence along the river bank in the disputed strip. I mean to say that there was a fence this side of that house. It is not a fact that when I built that camp or garage and filling station that I

tore whatever fence there was there down; some of it is still standing there, in spots. When I built the garage and filling station in 1921 I tore the fence down in front so people could get in. * * *

"That land is what was sold to me, and that is the reason why I claim it. I bought it and that is the reason I claim it. Of course I would claim it. I bought it and it was shown to me, and it was surveyed, and if it had not been that way I would not have bought it, I would not have claimed it. That fence I had was regular chicken wire, with barbed wire on top. There was barbed wire on top and chicken wire on the bottom. I did not have chicken wire all along the road. I had chicken wire in front of the houses. I had that chicken wire before I built the garage and filling station, and when I built the garage I tore the front out. I did not tear out all the front until I built the other houses. I did not tear that out down to the river, it still stands. It is not a fact that you can walk all over that place there, without you go through a gate. You can not walk around there without being interfered with by a wire fence. That steel frame I had there went from the garage to the house. I was going to build a big garage with that steel frame. The garage ran right to the point, the point of the land. I had a fence back to the river, and it still stands there. Part of the fence still stands along the bank of the river. I never had a fence all along the river bank, not back of the houses, so I could not get in the water, that is practically all disputed property. My fence was knocked down· in spots, at one little place there in back. The fence went from Doniphan Drive past my house, clean down to the camp ground. It is not there any more, has not·been there for several years. For a good many years it has not been there."

John Werthmann testified:

"My name is John Werthmann. I am thirty-eight years of age. My family consists of a wife and three children. I was married in 1915,· I do not remember the month. I was married right there where I àm living at the smelter. I was married in the house I am living in now. That house was built around in about 1913. My father died in 1914, December, the 1st, I think. I had been living in that house before he died. We built the next house around about 1915. That was an adobe house, 14x14 four rooms. That house has been torn down recently. We put a garage on that property, about thirty-six feet long, I don't know how wide. Pretty good sized garage. It fronts on the main highway. We put a steel frame on the garage, that is pretty good size, about twenty-five or thirty feet. I know where the disputed property is. It is where our improvements are. I have not lived anywhere else since I married. That has been my home all the time. Tom O'Keefe

never came around there. He never claimed any of the improvements put on there by my brother and I as his property. We had a wire fence around .the property. It started from the triangle. I know where the monument is, it started from the monument. The triangle is where the monument is. The fence starts in there and goes clean up the other side of the camp ground, and takes in our improvements. There was a wooden fence around all the houses. Part of the fence goes to the river.

"The back part of the fence went to the river. The far end, next to the smelter. The one next to town did not go to the river. We built that fence in 1913. We had it fenced all in between there then. We started to put the garage on there in 1919, I guess, and finished it in 1921. We did not commence using it until 1931. When we commenced using it we tore down our fence, had to tear it down before to get material in there to build, then put it up again after that sometime. When we commenced operating we tore it down. We did not have a fence there after that."

The monument referred to in the testimony is at the west corner of the area in dispute, marked D on the above plat.

We think this testimony amply sufficient to support the plea of limitation, even though the fence along the northwest and northeast lines may not have been very substantial nor maintained during the entire prescriptive period. In this connection we quote from Richards v. Smith, 67 Tex. 610, 4 S. W. 571, 573, where Judge Stayton said:

"We do not think an actual inclosure, by fence or otherwise, necessary in all cases to give an exclusive possession. The character and situation of the land, and the uses to· which it is adapted, and may be and is actually put, must be considered in determining whether an occupation is exclusive or not. To give title by limitation there must be an adverse claim and exclusive possession or occupation of the thing for the length of time and under the circumstances prescribed by the statute.

"The adverse claim may be manifested by facts which will not amount to an exclusive possession, while an exclusive possession may be such as to be sufficient evidence of an adverse claim. The placing of material around a tract of land for the purpose of erecting a fence, or the placing of material on land to erect a house, would be evidence, more or less strong, as it might be affected by other facts, that the person so placing material asserted a claim to be the owner of the land, and, unexplained, might be held sufficient evidence of an adverse claim.

·"If, in addition to placing material around a tract of land, the person so placing it should commence to erect a fence around it, and while doing so should, by other means than a

fence, secure to himself, and actually have, the exclusive possession and occupation of the land, it would seem that limitation would run from the time the exclusive occupation began. The facts must clearly show the adverse claim, and from its nature, as well as an exclusive possession, of which an inclosure substantial and permanent in character, accompanied with such use as the land is adapted to, is often the most satisfactory evidence.

"When the acts done upon a tract of land are such as to give unequivocal notice to all persons of a claim to it adverse to the claim of all others, and this is accompanied by an actual possession, exclusive in its character, then limitation will run in favor of the persons so asserting adverse claim, and enjoying an exclusive possession from the time such exclusive occupancy began, whether the land be inclosed or not."

The following cases support the view that the doctrine of encroachment has no present application, and sustain the finding upon the issue of limitation: Smith v. Jones, supra; Porter v. Miller, 76 Tex. 593, 13 S. W. 555, 14 S. W. 334; Fielder v. Houston Oil Co. (Tex. Civ. App.) 165 S. W. 48; Id. (Tex. Com. App.) 208 S. W. 158; Houston Oil Co. v. Loftin (Tex. Civ. App.) 194 S. W. 996; Woodley v. Becknell (Tex. Civ. App.) 214 S. W. 932; Lutcher v. Reed (Tex. Com. App.) 237 S. W. 913; Houston Oil Co. v. Davis (Tex. Civ. App.) 178 S. W. 669; Houston Oil Co. v. Griffin (Tex. Civ. App.) 166 S. W. 902.

In any event the charges above quoted were properly refused, because the case was submitted upon special issues, and in such case it is improper to give charges general in their nature and instructing the jury as to the law arising upon the facts. Harrington, Texas & N. O. Ry. Co. v. Harrington (Tex. Com. App.) 235 S. W. 188; Freeman v. Galveston, H. & S. A. Ry. Co. (Tex. Com. App.) 287 S. W. 202; Connellee v. Nees (Tex. Com. App.) 266 S. W. 502.

This ruling disposes of the first, second, fourth, and fifth propositions.

The sixth, seventh, and eighth propositions present no error. There is no issue of fraud in this case which would toll the statute of limitations.

The evidence excluded shows the Werthmanns were claiming that the line in dispute is where they have always contended it to be. Instead of misleading plaintiff, it put him upon notice of defendant's claim. Besides, plaintiff's own testimony shows that he has at all times known the defendants were actually living upon, claiming, and using the disputed area. No other conclusion can be drawn from his own testimony.

Affirmed.